# No. 23-6305

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### NATIONAL LABOR RELATIONS BOARD

Petitioner

v.

### BLUE SCHOOL

Respondent

---

## ON APPLICATION FOR ENFORCEMENT OF AN
## ORDER OF THE NATIONAL LABOR
## RELATIONS BOARD

---

## FINAL BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

**ELIZABETH A. HEANEY**
*Supervisory Attorney*

**JARED H. ODESSKY**
*Attorney*

*National Labor Relations Board*
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-1743**
**(202) 273-1937**

**JENNIFER A. ABRUZZO**
*General Counsel*

**PETER SUNG OHR**
*Deputy General Counsel*

**RUTH E. BURDICK**
*Deputy Associate General Counsel*

**DAVID HABENSTREIT**
*Assistant General Counsel*

# TABLE OF CONTENTS

**Headings**                                                                     **Page(s)**

Statement of Jurisdiction.................................................................................1

Statement of the Issues Presented ...................................................................2

Statement of the Case......................................................................................2

   I.  The Representation Proceeding ...................................................................2

     A.  Background; Blue School's Workforce......................................................2

     B.  The Petition and the Pre-Election Hearing ...............................................4

     C.  The Regional Director's Decision and Direction of Election; Blue School's First Request for Review ......................................................5

     D.  The Board-Supervised Election; Blue School's Challenges and Second Request for Review.......................................................................6

     E.  Blue School's Election Objection and Third Request for Review ...........7

   II.  The Unfair Labor Practice Proceeding ........................................................8

   III.  The Board's Conclusions and Order .........................................................8

Summary of Argument ....................................................................................9

Standard of Review........................................................................................11

Argument........................................................................................................12

     Blue School Violated the Act by Refusing to Recognize or Bargain with the Union........................................................................................12

     A.    The Board Has Broad Discretion in Conducting Representation Proceedings, and the Party Seeking to Overturn a Board-Approved Election Bears a Heavy Burden ...........................................................13

-i-

## TABLE OF CONTENTS (cont'd)

**Headings**                                                                                     **Page(s)**

B.   The Board Acted Within Its Wide Discretion in Ordering an
     Immediate Mail-Ballot Election ..........................................................14

     1.  The pre-election showing of interest is a nonlitigable issue ...........15

     2.  The Board correctly ordered an immediate election ......................20

         a.  The Board reasonably determined that Blue School does
             not employ faculty seasonally ...................................................21

         b.  At the time of the election, the unit comprised a substantial
             and representative complement of employees ...........................25

     3.  The Board properly exercised its discretion in selecting a mail-
         ballot format for the election ...........................................................27

         a.  The decision to hold a mail-ballot election due to the
             employees' scattered schedules was proper and is
             unchallenged ..............................................................................28

         b.  Covid-19 conditions also warranted a mail-ballot election ........30

C.   The Board Exercised Sound Discretion in Overruling Blue
     School's Objection and Certifying the Union Without a
     Post-Election Hearing...........................................................................37

     1.  To justify an evidentiary hearing, an employer must offer
         facts in support of its objection that, if credited, would
         warrant overturning the election ......................................................37

     2.  Blue School's proffer was insufficient to warrant a hearing,
         much less establish objectionable conduct......................................39

     3.  Blue School's arguments are unavailing .........................................46

D.   The Board's Order is Final and Reviewable ........................................48

## <u>TABLE OF CONTENTS (cont'd)</u>

**Headings**                                                    **Page(s)**

1.  The Act and administrative finality principles support judicial review of the Board's Order now ....................................................49

2.  Severance does not affect the Court's review .................................51

3.  Blue School's challenges to finality lack merit..............................55

Conclusion ...........................................................................................58

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                   **Page(s)**

*800 River Road Operating Co. v. NLRB*,
  846 F.3d 378 (D.C. Cir. 2017)................................................................38

*Acura of Bellevue v. Reich*,
  90 F.3d 1403 (9th Cir. 1996) ..............................................................51

*Adelphi Univ.*,
  195 NLRB 639 (1972) ........................................................................23

*Aero Indus., Inc.*,
  314 NLRB 741 (1994) ........................................................................46

*Alaska v. EPA*,
  244 F.3d 748 (9th Cir. 2001), *affirmed*,
  540 U.S. 461.................................................................................. 50-51

*Am. Fed'n of Labor v. NLRB*,
  308 U.S. 401 (1940).........................................................................50

*Amalgamated Clothing & Textile Workers v. NLRB*,
  736 F.2d 1559 (D.C. Cir. 1984) ..........................................................14

*Amalgamated Serv. & Allied Indus. Joint Bd. v. NLRB*,
  815 F.2d 225 (2d Cir. 1987)........................................................ 13-14, 41

*American Medical Response*,
  356 NLRB 199 (2010), *enforced*,
  477 F. App'x 743 (D.C. Cir. 2012)......................................................42

*Amoco Oil Corp.*,
  289 NLRB 280 (1988) ........................................................................22

*Antelope Valley Bus Co. v. NLRB*,
  275 F.3d 1089 (D.C. Cir. 2002).........................................................27

# TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*Aspirus Keweenaw*,
370 NLRB No. 45 (Nov. 9, 2020) ........................ 5, 28, 30, 31, 32, 33, 34, 35, 36

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964)............................................................... 1, 20, 56, 57

*Bos. Insulated Wire & Cable Sys., Inc. v. NLRB*,
703 F.2d 876 (5th Cir. 1983) ................................................................44

*Cast N. Am. v. NLRB*,
207 F.3d 994 (7th Cir. 2000) ................................................................27

*Continental Nut Co.*,
195 NLRB 841 (1972) ..........................................................................21

*Custom Deliveries*,
315 NLRB 1018 (1994) ....................................................................25-26

*Del Rey Tortilleria, Inc.*,
272 NLRB 1106 (1984), *enforced*,
823 F.2d 1135 (7th Cir. 1987) ..............................................................44

*Desert Inn & Country Club*,
220 NLRB 877 (1975) ..........................................................................48

*Durham Sch. Servs.*,
821 F.3d 52 (D.C. Cir. 2016)................................................................38

*Durham School Servs., LP*,
360 NLRB 851 (2014) ..........................................................................43

*EDS-IDAB, Inc. v. NLRB*,
666 F.2d 971 (5th Cir. 1982) ................................................................46

*Elsa Canning Co.*,
161 NLRB 137 (1966) ..........................................................................21

*Endicott Johnson de P.R.*,
172 NLRB 1676 (1968) ........................................................................25

## TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*Env't Def. Fund v. Johnson,*
    629 F.2d 239 (2d Cir. 1980)..............................................................50

*Flex Frac Logistics, LLC v. NLRB,*
    746 F.3d 205 (5th Cir. 2014) ............................................................52

*Fordham Univ.,*
    193 NLRB 134 (1971) ................................................................ 23, 24

*Francis v. Fiacco,*
    942 F.3d 126 (2d Cir. 2019)..............................................................19

*Freeman Decorating Co.,*
    336 NLRB 1 (2001), *enforcement denied on other grounds sub nom.*
    *IATSE Local 39 v. NLRB*, 334 F.3d 27 (D.C. Cir. 2003) ....................52

*Freund Baking Co.,*
    330 NLRB 17 (1999) ..........................................................................1

*Gen. Cable Corp.,*
    173 NLRB 251 (1969) ......................................................................25

*Glacier Packing Co.,*
    210 NLRB 571 (1974) ......................................................................44

*Great Atl. & Pac. Tea Co.,*
    113 NLRB 865 (1955) ......................................................................16

*Green Apple Supermarket of Jamaica, Inc.,*
    366 NLRB No. 124 (2018), *enforced,*
    805 F. App'x 65 (2d Cir. 2020) ........................................................41

*Gross v. Rell,*
    585 F.3d 72 (2d Cir. 2009)................................................................30

*Heartland of Martinsburg,*
    313 NLRB 655 (1994) ......................................................................38

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                            **Page(s)**

*Higgins, Inc.*,
    111 NLRB 797 (1955) ......................................................................17

*In re O.D. Jennings & Co.*,
    68 NLRB 516 (1946) ......................................................................15

*Intertype Co. v. NLRB*,
    401 F.2d 41 (4th Cir. 1968) ...................................................... 20-21

*J. Brenner & Sons, Inc.*,
    154 NLRB 656 (1965) ....................................................................42

*Kamtech, Inc.*,
    333 NLRB 242 (2001), *enforced*,
    314 F.3d 800 (6th Cir. 2002) ........................................................53

*Kearney & Trecker Corp. v. NLRB*,
    209 F.2d 782 (7th Cir. 1953) .........................................................19

*Kentucky River Med. Ctr.*,
    355 NLRB 643 (2010), *enforcement denied on other grounds sub nom.*
    *Jackson Hosp. Corp v. NLRB*, 647 F. 3d 1137 (D.C. Cir. 2011)........................52

*London's Farm Dairy, Inc.*,
    323 NLRB 1057 (1997) ..................................................................28

*Longmont United Hosp. v. NLRB*,
    70 F.4th 573 (D.C. Cir. 2023)............................................... 53, 54, 55

*Longmont United Hosp.*,
371 NLRB No. 162 (2022), *enforced*,
    70 F.4th 573 (D.C. Cir. 2023)........................................................54

*Luntz Iron & Steel Co.*,
    97 NLRB 909 (1951) ......................................................................42

*Mar-Jac Poultry Co.*,
    123 NLRB 1571 (1959) ..................................................................46

# TABLE OF AUTHORITIES (cont'd)

**Cases**          **Page(s)**

*Milchem, Inc.*,
   170 NLRB 362 (1968) ............................................................... 44, 45

*Mountain States Tel. & Tel. Co. v. FCC*,
   939 F.2d 1021 (D.C. Cir. 1991) ...........................................................51

*Natter Mfg. Corp. v. NLRB*,
   580 F.2d 948 (9th Cir. 1978) ...............................................................40

*Neb. Consol. Mills, Inc.*,
   165 NLRB 639 (1967) .........................................................................45

*Nestle Co.*,
   248 NLRB 732 (1980), *enforced mem.*,
   659 F.2d 252 (D.C. Cir. 1981) ............................................................46

*NLRB v. A. J. Tower Co.*,
   329 U.S. 324 (1946) .............................................................................13

*NLRB v. Air Control Prods.*,
   335 F.2d 245 (5th Cir. 1964) ......................................................... 16, 19

*AmeriCold Logistics*,
   214 F.3d 935 (7th Cir. 2000) ...............................................................37

*NLRB v. Arthur Sarnow Candy Co.*,
   40 F.3d 552 (2d Cir. 1994)............................................................. 12, 13

*NLRB v. Best Prods.*,
   765 F.2d 903 (9th Cir. 1985) ...............................................................34

*NLRB v. Birnie Bus Service, Inc.*,
   116 F.3d 1472 (2d Cir. 1997)..............................................................40

*NLRB v. Broyhill Co.*,
   526 F.2d 719 (8th Cir. 1976) ......................................................... 21-22

*NLRB v. Carl Weissman & Sons, Inc.*,
   849 F.2d 449 (9th Cir. 1988) ...............................................................38

# TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*NLRB v. G & T Terminal Packaging Co.*,
 246 F.3d 103 (2d Cir. 2001)...............................................................56

*NLRB v. HeartShare Human Servs. of N.Y., Inc.*,
 108 F.3d 467 (2d Cir. 1997)...............................................................12

*NLRB v. Hudson Oxygen Therapy Sales Co.*,
 764 F.2d 729 (9th Cir. 1985) .............................................................44

*NLRB v. IDAB, Inc.*,
 770 F.2d 991 (11th Cir. 1985) ...........................................................46

*NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers,
Loc. 433*,
 600 F.2d 770 (9th Cir. 1979) .............................................................54

*NLRB v. J. I. Case Co.*,
 201 F.2d 597 (9th Cir. 1953) .......................................... 15, 16, 18, 19

*NLRB v. Joclin Mfg. Co.*,
 314 F.2d 627 (2d Cir. 1963)...............................................................38

*NLRB v. Katz's Delicatessen of Houston St., Inc.*,
 80 F.3d 755 (2d Cir. 1996)......................................................... 12, 56

*NLRB v. Lance Investigation Service, Inc.*,
 680 F.2d 1 (2d Cir. 1982)...................................................................37

*NLRB v. Metro-Truck Body, Inc.*,
 613 F.2d 746 (9th Cir. 1979) ...................................................... 16, 20

*NLRB v. Newton-New Haven Co.*,
 506 F.2d 1035 (2d Cir. 1974)..............................................................38

*NLRB v. Olson Bodies, Inc.*,
 420 F.2d 1187 (2d Cir. 1970)..................................................... 12, 27, 34

*NLRB v. P.A.F. Equip. Co.*,
 528 F.2d 286 (10th Cir. 1976) ...........................................................16

-ix-

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                              **Page(s)**

*NLRB v. Sun Drug Co.,*
    359 F.2d 408 (3d Cir. 1966)....................................................................20

*NLRB v. White Constr. & Eng'g Co.,*
    204 F.2d 950 (5th Cir. 1953) ...............................................................15

*Nouveau Elevator Industries, Inc.,*
    326 NLRB 470 (1998) ..........................................................................33

*N.Y. Univ. (NYU I),*
    205 NLRB 4 (1973) ..............................................................................23

*N.Y. Univ. (NYU II),*
    221 NLRB 1148 (1975) ........................................................................23

*Palace Station Hotel & Casino,*
    367 NLRB No. 129 (2019) ............................................................ 53, 54

*Picini Flooring,*
    355 NLRB 606 (2010), *enforced sub nom.*
    *Int'l Union of Painters v. J&R Flooring, Inc.*, 656 F. 3d 860 (9th Cir. 2011)....52

*Polymers, Inc. v. NLRB,*
    414 F.2d 999 (2d Cir. 1969)....................................................... 14, 37, 38

*Public Utils. Comm'n v. FERC,*
    894 F.2d 1372 (D.C. Cir. 1990) ...........................................................51

*Roundy's Inc.,*
    356 NLRB 126 (2010), *enforced,*
    674 F.3d 638 (7th Cir. 2012) ...............................................................53

*Rynasko v. N.Y. Univ.,*
    63 F.4th 186 (2d Cir. 2023) .................................................................30

*S.H. Kress & Co.,*
    137 NLRB 1244 (1962) ........................................................................19

## TABLE OF AUTHORITIES (cont'd)

**Cases**            **Page(s)**

*Sackett v. EPA,*
566 U.S. 120 (2012) .................................................................51

*Saltwater, Inc.,*
324 NLRB 343 (1997) ..............................................................21

*San Diego Gas & Elec.,*
325 NLRB 1143 (1998) ............................................. 27, 28, 32, 33

*Shares, Inc.,*
343 NLRB 455 (2004), *enforced,*
443 F.3d (7th Cir. 2006) .........................................................24

*Shell Chem. Co. v. NLRB,*
495 F.2d 1116 (5th Cir. 1974) .................................................50

*Sheraton-Kauai Corp. v. NLRB,*
429 F.2d 1352 (9th Cir. 1970) .................................................35

*Sioson v. Knights of Columbus,*
303 F.3d 458 (2d Cir. 2002) .....................................................29

*Sorenson Lighted Controls, Inc.,*
286 NLRB 969 (1987) ..............................................................43

*Sparks Restaurant,*
366 NLRB No. 97 (2018) ..........................................................22

*Starbucks Corp.,*
371 NLRB No. 154 (Sept. 29, 2022) ........................................35

*Stephens Media, LLC,*
356 NLRB 661 (2011), *enforced,*
677 F.3d 1241 (D.C. Cir. 2012) ........................................... 52-53

*Sure-Tan, Inc. v. NLRB,*
467 U.S. 883 (1984) .................................................................56

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                      **Page(s)**

*Trailmobile, Div. of Pullman, Inc.*,
   221 NLRB 954 (1975) ...........................................................25

*Trenton Foods, Inc.*,
   101 NLRB 1769 (1953) ................................................. 18-19

*Trs. of Columbia Univ. in the City of N.Y.*,
   364 NLRB 1080 (2016) ......................................................24

*Tusculum Coll.*,
   199 NLRB 28 (1972) .........................................................23

*United Builders Supply Co.*,
   287 NLRB 1364 (1988) ................................................. 41-42

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951)...........................................................12

*UPS Ground Freight, Inc. v. NLRB*,
   921 F.3d 251 (D.C. Cir. 2019)...........................................28

*Wayneview Care Ctr. v. NLRB*,
   664 F.3d 341 (D.C. Cir. 2011)...........................................12

*Wright Mem'l Hosp. v. NLRB*,
   771 F.2d 400 (8th Cir. 1985) .............................................16


**Statutes**                                                   **Page(s)**

Section 1291 (28 U.S.C. § 1291)...............................................58

National Labor Relations Act, as amended

  (29 U.S.C. § 151 et seq.)

Section 8(a)(1) (29 U.S.C. § 158(a)(1))............................ 2, 8, 12

Section 8(a)(5) (29 U.S.C. § 158(a)(5))............................ 2, 8, 12

## TABLE OF AUTHORITIES (cont'd)

Section 9(c) (29 U.S.C. § 159(c)) .................................................................. 1, 18, 48

Section 9(c)(1)(A) (29 U.S.C. § 159(c)(1)(A))................................................. 15, 18

Section 9(d) (29 U.S.C. § 159(d))...........................................................................1

Section 10(a) (29 U.S.C. § 160(a)) .........................................................................1

Section 10(c) (29 U.S.C. § 160(c)) .......................................... 11, 49, 50, 53, 55, 56

Section 10(e) (29 U.S.C. § 160(e)) .................................... 1, 11, 49, 50, 54

**Rules**                                                                                          **Page(s)**

Fed. R. App. P. 28(a)(8)(A) ................................................................... 29

**Regulations**                                                                                    **Page(s)**

29 C.F.R. § 101.18 ................................................................................15

29 C.F.R. § 102.66(c) ...........................................................................38

29 C.F.R. § 102.67(b) ...........................................................................20

29 C.F.R. § 102.69(c)(1)(i) ....................................................................38

**Miscellaneous**                                                                                  **Page(s)**

NLRB Casehandling Manual (Part Two) § 11028.1 (2020) ..................................17

NLRB Casehandling Manual (Part Two) § 11029.1 (2020)...................................17

NLRB Casehandling Manual (Part Two) § 11029.3 (2020)...................................17

## STATEMENT OF JURISDICTION

This case is before the Court on the National Labor Relations Board's application for enforcement of a Board Decision and Order issued against Blue School on December 8, 2022 and reported at 372 NLRB No. 18. The Board had jurisdiction over the proceeding below pursuant to Section 10(a) of the National Labor Relations Act ("NLRA" or "the Act"), 29 U.S.C. § 160(a). This Court has jurisdiction under Section 10(e) of the Act, as the underlying unfair labor practice occurred in New York. 29 U.S.C. § 160(e). As we show at pp. 48-57 below, the Board's Order is final. The Board's application is also timely, as the Act provides no time limit for such filings.

The Board's Order is based, in part, on findings made in an underlying representation (election) proceeding (Board Case No. 02-RC-278139), and the record in that proceeding is also before the Court pursuant to Section 9(d) of the Act. 29 U.S.C. § 159(d); *see Boire v. Greyhound Corp.*, 376 U.S. 473, 477-79 (1964). The Court has jurisdiction to review the Board's actions in the representation proceeding for the limited purpose of "enforcing, modifying, or setting aside in whole or in part the [unfair-labor-practice] order of the Board." 29 U.S.C. § 159(d). The Board retains authority under Section 9(c) of the Act to resume processing the representation case in a manner consistent with the Court's rulings. 29 U.S.C. § 159(c); *see Freund Baking Co.*, 330 NLRB 17, 17 n.3 (1999).

1

## STATEMENT OF THE ISSUES PRESENTED

Blue School admits its refusal to recognize or bargain with its employees' bargaining representative Local 2110, Technical, Office & Professional Union, UAW, AFL-CIO (the "Union"). The ultimate question is whether substantial evidence supports the Board's finding that Blue School's refusal violated Section 8(a)(5) and (1) of the Act. That finding turns on the resolution of the following issues:

1. Whether the Board acted within its wide discretion in ordering an immediate mail-ballot election.

2. Whether the Board reasonably overruled Blue School's election objection and certified the Union without a post-election hearing.

3. Whether the Board's Order is final and reviewable.

## STATEMENT OF THE CASE

## I. THE REPRESENTATION PROCEEDING

### A. Background; Blue School's Workforce

Blue School operates a private educational institution for students ages 2 through 8th grade in New York City. (SA319, 1147; SA8.)[1] The school employs both faculty (teachers and curriculum-based staff) and nonfaculty. (SA319; SA1-

---

[1] "Br." refers to Blue School's proof brief. "SA" refers to the Appendix filed with the Court on April 18, 2024. References preceding a semicolon are to the Board's findings; those following are to the supporting evidence.

2

2.)

The Employee Handbook provides for paid school holidays in December/January (holiday break), February (mid-winter break), April (spring break), and mid-June to late August (summer break). (SA321 n.4, 322; SA236.) In addition, any employee can use Personal Time Off (PTO) days during the academic year. (SA320; SA236-237.) Faculty have 10 annual PTO days. (SA320; SA236.) Non-faculty PTO varies by position and tenure. (SA320; SA237-239.)

Some nonfaculty staff work on campus during the summer break. (SA320; SA17, 97.) Faculty and the school nurse typically do not report to campus. (SA320; SA12, 17.) Faculty may engage in professional development, curriculum planning, or committee work, but the school does not offer summer courses. (SA320; SA54, 59-60, 94.) Whether on campus or not, all employees can access school email accounts and the database throughout the summer. (SA322; SA94.) Faculty and non-faculty employees tend to use summer break for vacation. For the summer of 2021, however, Blue School's Board Chair knew of only two to three faculty who might be traveling. (SA322; SA12-13, 19, 115-116.) Rehired faculty return to campus in late August, which is also when newly hired faculty begin employment. (SA321; SA9, 17, 20, 112-113.)

Blue School pays both faculty and nonfaculty employees twice a month

3

regardless of whether school is in session. (SA320; SA93, 95-96.) Blue School makes annual hiring decisions each spring, at which time it sends employees offer letters. (SA320; SA94-96.) Outside the annual hiring process, employment levels rarely fluctuate. (SA321; SA95-96.)

For the 2020-2021 school year, Blue School had around 93 employees, including 63 faculty. (SA320; SA9.) For the 2021-2022 school year, it planned a staff reduction to about 45 because of declining enrollment and a consolidation of facilities. (SA320; SA10-12, 16.) Consistent with its practice, Blue School sent employment renewal offers in April 2021 with salary information for September 1, 2021, through August 31, 2022. (SA320; SA19-20, 24-25, 112.) Non-returning staff members' last day of work was June 18, 2021, and their last date on payroll was June 30, 2021. (SA320; SA19-20, 117.) As of August 6, 2021, Blue School had 38 employees and was hiring for seven vacant positions. (SA327 n.8.)

## B. The Petition and the Pre-Election Hearing

On June 7, 2021, following a campaign to organize Blue School employees, the Union filed a petition with the Board seeking a representation election among all full-time and regular part-time professional and nonprofessional employees. (SA318; SA164.) The Regional Director determined that the showing of interest for the Union sufficiently evidenced support for representation among employees and scheduled a pre-election hearing. (SA166-167.) The Union advocated for an

immediate mail-ballot election while Blue School argued for a manual election to be held in October.  (SA318-319.)  Blue School also sought to challenge the Union's showing of interest.  (SA318; SA123.)

### C. The Regional Director's Decision and Direction of Election; Blue School's First Request for Review

On August 6, the Regional Director issued a Decision and Direction of Election ordering an immediate mail-ballot election.[2]  (SA319, 332-333.)  First, the Regional Director concluded that an immediate election was appropriate because no exception supplanted the Board's standard policy of conducting expeditious elections.  (SA321-323.)  In particular, he found that Blue School employed staff year-round, not seasonally, and that a substantial and representative complement of the petitioned-for unit was currently employed.  (SA321-323, 326-328.)

Next, the Regional Director decided that a mail-ballot election was appropriate due to the scattered nature of the employees' summer schedules.  Alternatively, applying *Aspirus Keweenaw*, 370 NLRB No. 45 (Nov. 9, 2020), which established guidelines for determining whether to hold a mail-ballot election for reasons related to the Covid-19 pandemic, he determined a mail-ballot election

---

[2] The Regional Director explained that the ballots of professional employees would ask both (1) whether they wished to be included with nonprofessional employees for purposes of collective bargaining, and (2) whether they wished to be represented by the Union.  The ballots of nonprofessional employees would ask only whether they wished to be represented by the Union.  (SA332.)

was warranted because the trend in the number of new Covid-19 cases was increasing in New York County in the 14 days preceding his decision. (SA327-331.)

Finally, the Regional Director explicitly declined to reconsider the sufficiency of the Union's showing of interest. (SA318 n.1.) Blue School filed a request for review of the decision, which the Board denied. (SA381-382.)

### D. The Board-Supervised Election; Blue School's Challenges and Second Request for Review

The Board conducted a secret-ballot election by mail from August 16 to September 3. (SA332.) Per protocol, the Region sent each voter ballot instructions, a ballot, a blue mail-ballot envelope, and a yellow ballot-return envelope. (SA387-388.) The ballot instructions directed employees to mark their ballots in secret and mail them back immediately. (SA387-389.)

During the election period, eight employees posted pictures or videos on Instagram of themselves casting their ballots by mail. (SA734, 737; SA711-731.) The posts showed only the exteriors of employees' sealed yellow ballot-return envelopes, not their contents. (SA734; SA711-731.) Seven of the eight posts included expressions of support for the Union—variously, thumbs-up signs, pro-Union statements, and pro-Union hashtags. (SA385-388; SA711-731.)

After voting had concluded, Blue School challenged the ballots of the eight employees featured in the posts, claiming that the posts destroyed ballot secrecy

6

and constituted improper electioneering.  (SA385-386.)  The Regional Director

overruled those challenges and directed that the eight ballots be opened and

counted.  (SA391.)   Blue School sought review of the Regional Director's

decision, which the Board denied.  (SA694-695.)

The final count of the professional employees' ballots, including the eight

challenged ones cast by the employees featured in social media posts, showed that

a majority wished to be included in a bargaining unit with nonprofessionals, with

24 for inclusion, 3 against, and 3 nondeterminative challenges.  (SA733; SA696.)

The Region then counted the ballots of both professional and nonprofessional

employees.  The count revealed that employees overwhelmingly favored the

Union, with 24 for representation, 4 against, and 7 nondeterminative challenges.

(SA733; SA697.)

### E. Blue School's Election Objection and Third Request for Review

Blue School filed one election objection, contending that the Instagram posts

breached ballot secrecy and constituted improper electioneering.  (SA734.)  In its

offer of proof, Blue School submitted screenshots of the posts, provided the name

of a witness who it said would testify to the eight employees' conduct, and

indicated that it would subpoena some or all of the eight employees and an

unidentified Union representative.  (SA734; SA706-731.)

The Regional Director overruled the objection without a hearing and

certified the Union as the employees' representative.  (SA740.)  The Regional

Director first determined that the offer of proof did not meet the Board's

requirements for specificity.  (SA736.)  He then found no evidence showing that

the employees were union agents, but concluded that, regardless of whether the

first-party agent or third-party standard governed, Blue School could not

demonstrate objectionable conduct.  (SA736-740.)  Blue School filed a request for

review of the decision, which the Board denied.  (SA823.)

## II.    THE UNFAIR LABOR PRACTICE PROCEEDING

Following the Union's certification as bargaining representative, Blue

School refused to recognize or bargain with the Union.  (SA1146 n.5, 1147)  The

Board's General Counsel issued a complaint alleging that Blue School violated

Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(1), (5), and subsequently

filed a motion for summary judgment with the Board.  (SA1146.)  Blue School

filed a response contesting the validity of the Union's certification.  (SA1146 &

n.5.)

## III.   THE BOARD'S CONCLUSIONS AND ORDER

On December 8, 2022, the Board (Chairman McFerran and Members Kaplan

and Prouty) granted the General Counsel's motion for summary judgment and

found that Blue School violated Section 8(a)(5) and (1) of the Act by failing and

refusing to recognize or bargain with the Union.  (SA1147.)  The Board found that

8

all representation issues raised by Blue School were or could have been litigated in the underlying representation proceeding.  (SA1147.)

The Board's Order requires Blue School to cease and desist from the unfair labor practice found and from, in any like or related manner, interfering with, restraining, or coercing employees in the exercise of the rights guaranteed by the Act.  Affirmatively, the Board's Order requires Blue School to, on request, recognize and bargain with the Union as the exclusive representative of employees in the certified unit and to post a remedial notice.  (SA1148.)

Having provided immediate relief for the violation found, the Board also severed and retained for further consideration the General Counsel's request to adopt an additional, compensatory remedy requiring Blue School to make unit employees whole for the lost opportunity to bargain.  The Board explained that it was doing so to "expedite" the issuance of its Decision and Order resolving the case's remaining issues.  (SA1148.)  Following the issuance of the Board's Order, Blue School filed a motion for reconsideration asking the Board to decide the severed issue before requiring Blue School to bargain, which the Board denied on February 9, 2023.  (SA1156.)

## SUMMARY OF ARGUMENT

A Board-conducted representation election is presumptively valid, and a party seeking to overturn its results bears a heavy burden—one that Blue School

9

fails to shoulder. Consequently, its admitted post-certification refusal to recognize and bargain with the Union violated the Act.

First, the Board, vested with broad discretionary authority and charged with promptly resolving election issues, acted well within its discretion in ordering an immediate mail-ballot election. At the outset, the Board properly found that the showing of interest for the Union warranted the use of the Board's resources to conduct an election, and it appropriately rejected Blue School's efforts to litigate that wholly administrative determination. In then deciding to hold the election immediately, the Board faithfully applied its policy of conducting elections expeditiously after determining that no exception was applicable. Since Blue School's faculty are employed year-round, the Board saw no basis for ordering an election at a peak "season." Likewise, because Blue School already employed an overwhelming and representative majority of the eventual unit, the Board found no reason for delay. In also opting to conduct the election by mail, the Board relied on two independently sufficient criteria: (1) the fact, unchallenged by Blue School, that employees were scattered, and (2) the increase in the 14-day trend in the number of new Covid-19 cases in New York County.

Second, the Board again exercised its discretion soundly in overruling Blue School's objection to the election—which alleged violations of ballot secrecy and improper electioneering—and certifying the Union without a post-election hearing.

10

The Board found that Blue School's offer of proof failed to adequately identify the individuals it sought to subpoena or to summarize their anticipated testimony. The Board then determined that, even assuming the truth of the offered facts, they did not amount to objectionable conduct. In brief, the Instagram posts' depiction of the outside of ballot-return envelopes accompanied by pro-Union gestures or messages did not compromise the secrecy of employees' ballots, nor did the potential visibility of the posts to Blue School employees meet the standard for electioneering, which requires involuntary physical confrontation.

Finally, the Board's Order is final and reviewable under Section 10(c) and (e) of the Act. The Order mandates immediate relief to remedy Blue School's adjudged violation of its employees' statutory rights, including by directing Blue School to bargain with the Union. The propriety of judicial review at this time is not defeated merely because the Board also severed and retained for further consideration one discrete remedial issue. Courts have consistently reviewed Board decisions from which a single issue has been severed, and the D.C. Circuit recently affirmed its jurisdiction in a case where the Board severed the exact remedial issue at issue here.

## STANDARD OF REVIEW

In opposing enforcement of the Board's Order, Blue School must surmount three hurdles of deference that strongly favor the Board. First, the Court affords

the Board broad discretion in the conduct of representation elections, subject to review only for "the most glaring discrimination or abuse." *NLRB v. Arthur Sarnow Candy Co.*, 40 F.3d 552, 556 (2d Cir. 1994) (quoting *NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970)). Second, the Court reviews the Board's factual findings in the representation proceeding and the finding of an unlawful refusal to bargain for substantial evidence on the record as a whole, *id.*, measured by whether "a reasonable mind might accept [it] as adequate to support a conclusion," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951). Finally, the Court "must enforce the Board's order where its legal conclusions are reasonably based." *See NLRB v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 763 (2d Cir. 1996).

## ARGUMENT

## BLUE SCHOOL VIOLATED THE ACT BY REFUSING TO RECOGNIZE OR BARGAIN WITH THE UNION

An employer violates Section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5), (1), when it refuses to recognize or bargain with employees' chosen agent. *NLRB v. HeartShare Human Servs. of N.Y., Inc.*, 108 F.3d 467, 470 (2d Cir. 1997).[3] Blue School has admittedly refused to recognize or bargain with the Union

---

[3] A violation of Section 8(a)(5) produces a derivative violation of Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), which makes it unlawful for employers to "interfere with, restrain, or coerce employees in the exercise of the[ir] rights . . . ." *See Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 347 n.1 (D.C. Cir. 2011).

12

in order to contest the Board's certification of the Union as the exclusive representative of employees in the unit at Blue School. (Br. 16.) Thus, if the Court upholds the certification, it should enforce the Board's Order.

In contesting the Union's certification, Blue School maintains that the Board should not have ordered an immediate mail-ballot election or overruled its election objections without a hearing. In challenging the finality of the Board's Order, Blue School contends that the severance of a single remedial issue makes review premature. None of its arguments succeed.

### A. The Board Has Broad Discretion in Conducting Representation Proceedings, and the Party Seeking to Overturn a Board-Approved Election Bears a Heavy Burden

"Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." *NLRB v. A. J. Tower Co.*, 329 U.S. 324, 330 (1946). Because the conduct of representation elections is "the very archetype of a purely administrative function, with no *quasi* about it," "courts should not interfere" absent blatant abuse. *NLRB v. Arthur Sarnow Candy Co.*, 40 F.3d 552, 556 (2d Cir. 1994) (quotation omitted).

Although the Board has long strived for "laboratory conditions" in elections, "it is probably not possible to completely achieve such ideal conditions," and the concept "must be realistically applied." *Amalgamated Serv. & Allied Indus. Joint*

13

*Bd. v. NLRB*, 815 F.2d 225, 227 (2d Cir. 1987). This Court entrusts the Board with "broad discretion to determine whether the circumstances of an election come sufficiently close" to ideal. *Id.* Moreover, the standard for overturning an election is demanding because ordering a rerun election poses its own danger to the effectuation of employee free choice. *Amalgamated Clothing & Textile Workers v. NLRB*, 736 F.2d 1559, 1563-64 (D.C. Cir. 1984). The delay inherent in holding a second election "almost inevitably works to the benefit of the employer and may frustrate the majority's right to choose to be represented by a union," by "play[ing] into the hands of employers who capitalize on the delay." *Id.* at 1563. Accordingly, the "heavy" burden of demonstrating that an election was invalid "falls upon the party attacking it." *Polymers, Inc. v. NLRB*, 414 F.2d 999, 1004 (2d Cir. 1969).

### B. The Board Acted Within Its Wide Discretion in Ordering an Immediate Mail-Ballot Election

The Board followed established Board policy and court precedent in holding an immediate mail-ballot election. First, the Board correctly assessed that the Union's showing of interest was sufficient at the time the petition was filed and refused Blue School's attempt to contest that showing. Second, in line with the Board's usual prioritization of expeditious elections, it found no reason to delay the election until the start of the school year; no seasonal exception applied and Blue School presently employed a substantial and representative complement of the

14

unit.  Finally, the Board properly ordered a mail-ballot election given both the scattered workforce and Covid-19 conditions at the time of scheduling.

## 1.  The pre-election showing of interest is a nonlitigable issue

The Board's first action upon receiving a representation petition is to examine whether enough employees have expressed interest in representation by the Union to merit the conduct of a formal Board election.  Section 9(c)(1)(A) of the Act states, in relevant part, that the Board will investigate a representation petition when the petition alleges that "a substantial number of employees . . . wish to be represented for collective bargaining."  29 U.S.C. § 159(c)(1)(A).  In accordance with that section, the Board will generally not entertain a petition unless the union demonstrates a showing of interest from 30 percent of employees in the unit for which representation is sought.  29 C.F.R. § 101.18.

The purpose of the showing of interest is to "enable[] the Board to screen out petitions with little or no prospect of success."  *NLRB v. White Constr. & Eng'g Co.*, 204 F.2d 950, 953 (5th Cir. 1953).  The Board seeks to "determine for itself whether or not further proceedings are warranted, and to avoid needless dissipation of the [g]overnment's time, effort, and funds."  *NLRB v. J. I. Case Co.*, 201 F.2d 597, 599 n.3 (9th Cir. 1953) (quoting *In re O.D. Jennings & Co.*, 68 NLRB 516, 518 (1946)).  In light of the guideline's limited purpose of screening cases to determine whether they warrant agency expenditure of funds, "courts have

15

consistently held that 'the validity of the showing of interest is for administrative determination and may not be litigated by the parties at any stage of the proceeding.'" *Wright Mem'l Hosp. v. NLRB*, 771 F.2d 400, 406 (8th Cir. 1985) (quoting *NLRB v. Air Control Prods.*, 335 F.2d 245, 250 (5th Cir. 1964)); *accord NLRB v. Metro-Truck Body, Inc.*, 613 F.2d 746, 750 (9th Cir. 1979) (collecting additional cases from Fourth, Sixth, Seventh, and D.C. Circuits); *NLRB v. P.A.F. Equip. Co.*, 528 F.2d 286, 287 (10th Cir. 1976). After all, the election, not the showing of interest, decides whether employees support union representation and thus whether an employer must bargain. *J. I. Case*, 201 F.2d at 600. What's more, barring litigation over the showing of interest serves to safeguard the identities of union supporters, since "a trial of that nature would bring about disclosure of the individual employees' desires with respect to representation." *Id.*

Under established Board policy, the showing of interest is measured against the number of employees in the unit when the petition was filed. *See Great Atl. & Pac. Tea Co.*, 113 NLRB 865, 865 (1955). Here, the Regional Director followed that policy when he measured the showing of interest for the Union on the date that the Union filed the petition (June 7, 2021) and rejected Blue School's argument that the showing of interest should have been measured after the non-returning employees' last day of work (June 18, 2021, though their last payroll date was June 30, 2021). (Br. 43.) The Board, echoing the view of every circuit court, properly

16

rejected Blue School's efforts to litigate this determination. (SA318.)

Blue School concedes that the adequacy of the showing of interest is generally nonlitigable. Undeterred, it tries three routes to bypass the rule. (Br. 45.) All are dead ends, failing to show why the Board should have deviated from established precedent.

First, Blue School strains to fit this case into the narrow exception permitting regional directors to conduct administrative investigations into the showing of interest where a party has credibly submitted evidence of forgery, misconduct, or fraud. (Br. 45-47 (referencing NLRB, Casehandling Manual Part Two: Representation Proceedings, § 11028.1, 11029.1, 11029.3 (Sept. 2020).) In so doing, it falsely equates credible evidence of deceptive and even criminal conduct with the purely speculative claim that the Union intentionally timed the filing of its petition to benefit from the support of current but non-returning employees. (Br. 47.) Despite Blue School's hyperbolic framing, nothing is exceptional—let alone fraudulent—about workers seeking union representation amidst fluctuating employment levels. In cases of more drastic employee turnover, the Board has seen no reason to deviate from measuring the showing of interest at the time when the petition was filed. *Higgins, Inc.*, 111 NLRB 797, 798 n. 2 (1955) (showing measured at filing when employer had 224 employees despite prior peak of 1,113 employees and recent increase to 304 employees); *Trenton Foods, Inc.*, 101 NLRB

1769, 1770 (1953) (showing measured at filing when employer had 64 employees despite regular complement of 225 employees).[4]

Testing another route, Blue School contends that Section 9(c) of the Act requires a hearing on the showing of interest. But this argument confuses two distinct concepts: (1) the petition's allegation of a "substantial number of employees" desiring representation, and (2) the existence of "a question of representation affecting commerce." *See J. I. Case*, 201 F.2d at 600 (concluding from the text of Section 9(c) that the sufficiency of employees' union interest is irrelevant to the existence of a question of representation). The first pertains to the showing of interest, the concept at issue here. *See id.* at 598-600. The second concerns, among other things, the Board's jurisdiction. *See id.* at 600. Section 9(c) requires an "appropriate hearing" only for disputes over the latter. *See* 29 U.S.C. § 159(c)(1)(A).

Finally, Blue School claims that not being able to litigate the showing of interest violates its due process rights under the Fifth Amendment and the Administrative Procedure Act (APA). (Br. 47.) Underlying Blue School's

---

[4] Relatedly, Blue School claims that the Board's application of its "rote, inflexible standard" (Br. 47, 51) is "easily manipulated by a union" and has "the potential to be unfair" (Br. 47). It offers no evidence other than the instant case, which only shows that a staff reduction followed the showing-of-interest determination. More to the point, nothing is arbitrary or unfair about the Board's consistent application of its policy, especially compared to Blue School's proposed alternative of making a special exception.

contentions, however, is a basic misunderstanding of the purpose behind the showing-of-interest requirement, which is to make Board operations more efficient; it is simply "a means of facilitating the Board's decision as to whether the circumstances justify holding an election at all." *NLRB v. Air Control Prods.*, 335 F.2d 245, 250 (5th Cir. 1964). Here, Blue School claims that it had a right to intervene in an administrative process that was conducted solely for the Board's own purposes. *S.H. Kress & Co.*, 137 NLRB 1244, 1248 (1962). Yet no basis for such a right exists. *See Kearney & Trecker Corp. v. NLRB*, 209 F.2d 782, 788 (7th Cir. 1953) (APA provides no right to challenge showing of interest). To invoke due process, a party must have a cognizable interest at stake. *Francis v. Fiacco*, 942 F.3d 126, 141 (2d Cir. 2019). Employers, however, lack a legitimate interest at the showing-of-interest stage, which Congress placed squarely in the Board's domain. *J. I. Case Co.*, 201 F.2d at 599. Indeed, the purpose of the showing of interest is to protect *the Board*'s resources, not to shield the employer from a representation election. *NLRB v. Metro-Truck Body, Inc.*, 613 F.2d 746, 750 (9th Cir. 1979) (the requirement is "simply to aid the NLRB"). In addition, the showing of interest does not "in any way affect an employer's obligations with respect to the Union" since "the election . . . decides whether the employer is obligated to recognize" it. *Kress*, 137 NLRB at 1248.

Nonetheless, Blue School bemoans that its inability to contest the Board's

19

satisfaction with the Union's showing set in motion a process that purportedly cost it time and money and led to reputational damage. (Br. 44-45.) Blue School makes these claims without a scintilla of specificity or proof. Even if it had offered evidence of these harms, it has not cited a single case demonstrating that they would warrant Blue School's intervention in this purely administrative, resource-driven determination. In short, Blue School has failed to show that the Board's desire to efficiently resolve an administrative matter antecedent to an election—the proceeding, after all, that actually decides an employer's obligations vis-a-vis a union—somehow violates its constitutional rights or the APA.

### 2. The Board correctly ordered an immediate election

The Board's decision not to postpone the election until after the start of the school year was consistent with Board policy. The applicable Board rules instruct regional directors to determine, within their judgment, "the earliest date practicable" for scheduling an election. 29 C.F.R. § 102.67(b). Underlying the emphasis on expedition is an understanding that delay can wreak havoc on employees' right to choose representation, impairing a union's support "by attrition and delay." *Boire v. Greyhound Corp.*, 376 U.S. 473, 478 (1964) (quoting H.R. Rep. No. 972, at 5 (1935)); *NLRB v. Sun Drug Co.*, 359 F.2d 408, 414 (3d Cir. 1966) ("Time is a critical element in election cases."). Courts have embraced the Board's approach. *See, e.g.*, *Intertype Co. v. NLRB*, 401 F.2d 41, 44 (4th Cir.

20

1968) (election should be held as soon after petition filing as is reasonably possible).

The Board's firm policy of expedition softens in only a narrow set of circumstances, including (1) where workers in the unit are employed seasonally, and (2) where current employees are not a substantial and representative complement of the planned unit. In this case, the Board properly concluded that neither exception applied and directed an immediate election.

### a. The Board reasonably determined that Blue School does not employ faculty seasonally

Blue School maintains that the election should have been delayed until after the start of the school year because faculty are seasonal employees. In cases of seasonal employment, the Board will, in its discretion, "direct an election at or near the peak season." *Saltwater, Inc.*, 324 NLRB 343, 344 (1997). The Board considers employees to be seasonal when an employer hires them during one or more peak employment "seasons" during the year but otherwise lays them off between their periods of work. *See, e.g.*, *Continental Nut Co.*, 195 NLRB 841 (1972) (in normal year, employer starts hiring seasonal employees in August and lays them off by March 1). By contrast, the Board will not consider employees to be seasonal when they remain on the employer's payroll year-round. *See Elsa Canning Co.*, 161 NLRB 137, 144 (1966) (using payroll records to determine that certain workers were not year-round employees); *cf. NLRB v. Broyhill Co.*, 526

21

F.2d 719, 720-21 (8th Cir. 1976) (Board approximated number of year-round employees using end-of-season payroll). The Board considers workers on scheduled leave to be currently employed. *Cf. Sparks Restaurant*, 366 NLRB No. 97, slip op. at 12 (2018) (workers on "long vacations or leaves of absence" remain employed); *Amoco Oil Corp.*, 289 NLRB 280 (1988) (employee on payroll while on vacation eligible to vote even though employee was not working).

Substantial evidence supports the Board's conclusion that Blue School's faculty are year-round employees with no peak season, leaving no reason to delay the election until after the start of the school year. (SA321-323.) The Board found "no record evidence that Blue School hires faculty and non-faculty employees for a 'season' or has a 'seasonal' operation," nor any evidence that employees are laid off and then recalled for a "season," or replaced "season to season." (SA321-322.) Rather, all evidence indicated that faculty maintain their employment throughout the year with little to no fluctuation. (SA321.)

In making this finding, the Board appropriately relied on Blue School's payroll schedule, under which employees receive pay twice every month of the year regardless of whether they report to campus. (SA322.) It also looked to Blue School's Employee Handbook, which considers summer break to be paid leave for faculty like any other break or holiday. (SA322.) Next, the Board noted that all unit employees can remotely access school email accounts and the database

22

throughout the summer. (SA322.) Finally, the Board pointed to Blue School's practice of sending offer letters to employees each spring with salary information for the coming year, which indicates annual rather than seasonal hiring. (SA322.)

The Board correctly rejected Blue School's claim (Br. 29-30) that, under controlling Board law, faculty who do not teach during the summer are seasonal employees. As the Board explained, in a handful of earlier cases it had ordered the postponement of elections involving teachers at academic institutions. *N.Y. Univ. (NYU II)*, 221 NLRB 1148, 1157 (1975); *N.Y. Univ. (NYU I)*, 205 NLRB 4, 10 (1973); *Adelphi Univ.*, 195 NLRB 639, 649 (1972); *Tusculum Coll.*, 199 NLRB 28, 33 (1972); *Fordham Univ.*, 193 NLRB 134, 140 (1971). However, in no case did it base the delay on a finding that teachers are seasonal employees. Rather, in *NYU I* and *II* and *Adelphi*, the Board postponed the election at the specific request of the parties. *NYU II*, 221 NLRB at 1157 (parties jointly requested timing of election); *NYU I*, 205 NLRB at 10 (same); *Adelphi*, 195 NLRB at 649 (parties requested that election be held sometime between September and June). In two others, *Tusculum* and *Fordham*, the Board merely exercised its discretion over timing: because many faculty at each school were not working during the summer, the Board chose to briefly delay the election from mid-September until the imminent start of fall classes. *Tusculum*, 199 NLRB at 33; *Fordham*, 193 NLRB at 140. In marshaling support for its choice, the Board in *Fordham* analogized the postponement in that

23

case to the customary practice in seasonal industries. *Fordham*, 193 NLRB at 140 n.24. But the Board never went so far as to find that faculty on leave for the summer are seasonal employees. *See id.* To date, Blue School has offered no case that stands for this proposition. [5]

Blue School contends that the Board should not have been "constricted by nomenclature." (Br. 27.) The essence of this argument is that the Board, after finding that no formal seasonal-employment exception applied, should still have exercised its discretion to postpone the election. But the Board acted well within its broad authority when it saw no reason to do so. Principally, it found no evidence in the record that employees would be unavailable for a summer election. Out of approximately 38 employees, the record only contained evidence that two to three faculty might be traveling at some point during the summer. (SA322.) For this reason, Blue School's claim (Br. 33) that it was "reasonable to assume" employees would not have been at their provided addresses is contrary to evidence. Given the Board's justified exercise of its wide discretion, the analysis here starts and ends with the Board's proper finding that Blue School does not employ faculty on a seasonal basis.

---

[5] *Trustees of Columbia University in the City of New York*, 364 NLRB 1080 (2016), (Br. 30) did not involve a postponed election. Its discussion of seasonal employment is immaterial, limited to comparing the Board's assertion of jurisdiction over the high-turnover student assistant workforce with its involvement in cases involving seasonal employees. *See id.* at 1091 n.92.

### b. At the time of the election, the unit comprised a substantial and representative complement of employees

The Board correctly rejected Blue School's claim (Br. 33-35) that failing to delay the election until after the start of the school year would "disenfranchise" newly hired employees. In line with its precedent, the Board chose instead to immediately enfranchise the substantial and representative complement of employees in the unit at the time that the Regional Director scheduled the election. (SA326-328.)

Where a party to an election petition claims that the unit currently lacks a sufficient complement of employees, the Board will assess the evidence of the employer's plans for the unit and determine whether to dismiss the petition as premature. *See, e.g., Trailmobile, Div. of Pullman, Inc.*, 221 NLRB 954, 954-55 (1975). If the Board finds the existing complement is substantial and representative, it will direct an immediate election. *See Gen. Cable Corp.*, 173 NLRB 251, 251-52 (1969). The Board sets no specific minimum requirements for whether an existing complement of employees is substantial and representative. *See Endicott Johnson de P.R.*, 172 NLRB 1676, 1677 n.3 (1968) (rejecting strict numerical test). Nonetheless, the standard is unquestionably met when at least 30 percent of the eventual employee complement is employed in 50 percent of the anticipated job classifications. *See Shares, Inc.*, 343 NLRB 455, 455 n.2 (2004), *enforced*, 443 F.3d 939 (7th Cir. 2006); *Custom Deliveries*, 315 NLRB 1018, 1019

25

n.8 (1994).

Here, the Board's determination that the employee complement was substantial and representative at the time the Regional Director scheduled the election (SA328) is supported by substantial evidence in the record. On August 6, 2021, the Regional Director found that current employees constituted at least 84 percent (38 employees) of the eventual unit (45 employees). (SA327 & n.8.) Because Blue School never argued it would create new job categories, the Regional Director further found that current employees occupied 100 percent of the unit classifications. (SA327.) Consequently, the Board reasonably calculated that current employees far surpassed the minimum benchmark for a substantial and representative complement of the planned unit.

Blue School says that the election should have been postponed until after new employees joined in the fall, when the employee complement would have been *more* substantial. (Br. 34-35.) However, the Board's precedent focuses only on whether the unit currently includes a substantial number of employees, not when it might have the most substantial number in the future. Even under Blue School's version of the facts (Br. 40), nearly 80 percent (39 employees) of the planned unit (49 employees[6]) was employed at the time of the election, still

---

[6] On August 20, 2021, two weeks after the Regional Director directed the election, Blue School moved to reopen the record to submit evidence of a new estimate of

26

undoubtedly substantial under Board law. By any cut of the numbers, the Board appropriately determined that the employee complement in August 2021 was substantial and representative.

### 3. The Board properly exercised its discretion in selecting a mail-ballot format for the election

In addition to appropriately ordering an immediate election, the Board correctly directed a mail-ballot election. (SA332.) The authority over representation proceedings entrusted to the Board by Congress includes the "broad discretion" to determine, under the "peculiar conditions" of each case, whether an election will be conducted by mail or in person. *San Diego Gas & Elec.*, 325 NLRB 1143, 1144-45 (1998) (quotation marks omitted); *accord Cast N. Am. v. NLRB*, 207 F.3d 994, 999-1000 (7th Cir. 2000). The choice of a mail-ballot election must be upheld as long as it was not arbitrary, even if the Court would have selected a different kind of election. *See Antelope Valley Bus Co. v. NLRB*, 275 F.3d 1089, 1095 (D.C. Cir. 2002); *see also NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970) (Board could choose whether or not to arrange for absentee or home voting).

Here, the Board employed two alternative and independent tests for selecting

---

49 employees in the eventual unit. (SA336-338, 342.) This information was unavailable to the Regional Director when he scheduled the election and, regardless, would not have affected the Board's determination as to the sufficiency of the existing complement.

27

between a mail-ballot and manual election. First, using the traditional test of assessing whether geography, schedules, or labor activity present a challenge to in-person voting, the Board determined that a mail-ballot election was justified because employees were scattered by their work schedules—in this case, faculty employees' paid leave during summer break. (SA327-328.) Second, applying *Aspirus Keweenaw*, 370 NLRB No. 45 (Nov. 9, 2020), the Board found that a mail-ballot election was also warranted because the 14-day trend in the number of new Covid-19 cases in New York County was increasing. (SA328-331.) Before the Court, Blue School challenges the Board's analysis under *Aspirus* but not the traditional test, conceding one of the Board's standalone justifications for choosing a mail-ballot election.

### a. The decision to hold a mail-ballot election due to the employees' scattered schedules was proper and is unchallenged

The Board's traditional test provides for mail-ballot elections when, among other scenarios, "voters are 'scattered' over a wide area or across different work schedules." *UPS Ground Freight, Inc. v. NLRB*, 921 F.3d 251, 256 (D.C. Cir. 2019) (citing *San Diego Gas*, 325 NLRB at 1145). This standard is not intended to apply narrowly. Rather, it covers "any situation where all employees cannot be present at the same place at the same time." *San Diego Gas,* 325 NLRB at 1145 n.7; *accord London's Farm Dairy, Inc.*, 323 NLRB 1057, 1057 (1997) (directing

28

mail-ballot election where holding manual election would require making employees report to workplace to vote during what would otherwise be off-work hours).

Here, the Board properly determined that, at the time the Regional Director scheduled the election, Blue School's employees were "scattered" because of their work schedules. (SA327-328.) The Board highlighted that, for faculty employees, summer break is "integrated into" their yearlong employment as paid leave. (SA328.) Because of this scheduling choice, faculty were not reporting to campus in the summer of 2021 and thus would not be on-site for a manual election. Given the Board's well-substantiated finding that employees were scattered by their summer schedules, it appropriately directed an election by mail.

In its opening brief, Blue School fails to contest—and has therefore waived the ability to challenge—the Board's application of the traditional test. An appellant's opening brief "must" contain "[its] contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies." Fed. R. App. P. 28(a)(8)(A). "These requirements are mandatory." *Sioson v. Knights of Columbus*, 303 F.3d 458, 459 (2d Cir. 2002). Further, "[t]o make a legal argument is to advance one's contentions by connecting law to facts" (*id.* at 460), and "[i]ssues not sufficiently argued" in an appellant's opening brief "are in general deemed waived and will not be considered on

29

appeal." *Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009).

Blue School's waiver spares this Court from further inquiry before upholding the Board's mail-ballot election decision. As the Board here noted, the traditional test supplied an independent basis for the use of a mail-ballot format, since a mail-ballot election would have been appropriate in this case "even in the absence of a pandemic." (SA328.) Given that Blue School leaves this standalone justification for the Board's choice unchallenged, the Court need not reach the Board's application of *Aspirus* to affirm the decision to conduct the election by mail.

### b. Covid-19 conditions also warranted a mail-ballot election

The onset of the Covid-19 pandemic in early 2020 constituted an "unprecedented public health emergency." *Rynasko v. N.Y. Univ.*, 63 F.4th 186, 189 (2d Cir. 2023). In these "extraordinary" circumstances, the Board endeavored to continue performing its statutory mission, including conducting representation elections. *Aspirus Keweenaw*, 370 NLRB No. 45, slip op. at 1, 3-4, 8.

In furtherance of these efforts, in November 2020, the Board issued *Aspirus*, which established guidelines under which the Board's regional directors should exercise the Board's discretion in deciding whether to conduct a representation election by mail for reasons related to the Covid-19 pandemic. *Id.* at 1, 4-8. The Board recognized the greater health and safety risks posed by in-person elections,

30

*id.* at 3-6, and held, among other things, that if any one of several specified situations are present, then a regional director's determination to direct a mail-ballot election on that basis will constitute an appropriate exercise of the Board's discretion, *id.* at 4-8.

One such situation is where "the 14-day trend in the number of new confirmed cases of Covid-19 in the county where the facility is located is increasing." *Id.* at 5. The Board explained that such an increase would "suggest[] that the virus is spreading in [the] locality" where an in-person election would be conducted, warranting the use of mail-ballot procedures "in the interest of public safety." *Id.* at 6. It instructed regional directors to determine the presence or absence of such an increase by consulting data published on a website maintained by the Johns Hopkins University & Medicine Coronavirus Resource Center ("Hopkins website"). *Id.* at 5 & n.22. The Board further told regional directors to measure the 14-day period from as close to their determination as available data would allow. *Id.* at 5 n.20.

Here, the Board acted within its broad authority and consistent with *Aspirus* in directing a mail-ballot election. Specifically, the Regional Director followed *Aspirus*'s instruction by consulting the New York County portion of the Hopkins website to assess whether the county's 14-day case trend was increasing. On August 6, 2021, the Regional Director visited the website and retrieved the daily

31

change in new cases for each day from July 23 to August 5, 2021. By averaging the change in the number of new daily cases in the county over that period, the Regional Director calculated that the number of new daily cases rose at an average rate of 5 cases per day in the preceding 14 days. (SA330.) Assessing the greater health and safety risks that an in-person election would pose consistent with *Aspirus*, the Board properly exercised its broad discretion in opting to conduct the election by mail.

Faced with the heavy burden of demonstrating abuse of discretion by the Board, Blue School launches scattershot attacks against the choice to hold a mail-ballot election under *Aspirus*. Each misses the mark.

Blue School begins by inaccurately characterizing Board doctrine on mail-ballot elections (Br. 35-36.) First, Blue School repeatedly claims (Br. 3, 35) that Board policy favors manual over mail-ballot elections unless "infeasible," yet it draws this misstatement of law from the opinion of *the dissenting Board members* in *San Diego Gas*. 325 NLRB at 1150 (Hurtgen and Brame, dissenting). Meanwhile, the majority in *San Diego Gas* expressly rejected this "infeasibility" standard. *Id.* at 1144-45 & n.6, 1146-47 (majority opinion). Second, Blue School suggests that the Board views mail-ballot elections as inferior since they often result in lower turnout. But the Board has been clear that this is not its view. The *San Diego Gas* majority openly dismissed low turnout as a basis for opposing

32

mail-ballot elections, explaining that "mail ballot elections have, by design, largely been limited to situations where factors were present which were likely to inhibit voter participation if the election were conducted manually," thus leaving "no reason to believe that participation in [such] elections would necessarily have been higher had they been manual elections." *Id.* at 1146. Third, Blue School simply ignores that pre-*Aspirus* precedent allowed for the direction of a mail-ballot election in the presence of undefined "extraordinary circumstances," including those making an in-person election "impractical" or "not easily done." *Id.* at 1145 & n.6. While the Board defaults to in-person elections "as a general rule," *id.* at 1144, it has long recognized that regional directors have broad discretion to decide that a particular election will be conducted by mail, *Nouveau Elevator Industries, Inc.*, 326 NLRB 470, 471 (1998); *San Diego Gas*, 325 NLRB at 1144-45 & n.4.

Next, Blue School aims to sow doubt about the weight this Court should accord the Board's establishment of reasonable safety standards for representation elections. It asserts—citing only non-majority opinions—that the Board does not deserve "any agency deference" because it lacks expertise in "disease control, healthcare policy, or epidemiology." (Br. 38-39.) Yet the source of the Board's considerable deference in setting election safety standards is not any claim to medical expertise but rather its wide-ranging authority over "the conduct of representation elections," a "purely administrative function" rarely suitable for

33

"judicial intervention." *NLRB v. Olson Bodies, Inc.*, 420 F.2d 1187, 1189 (2d Cir. 1970) (refusing to disturb Board's choice of whether to arrange for absentee or home voting by ill employees). The Board's mandate to "control . . . the election proceeding" is a responsibility and "area of expertise" that Congress "entrusted to the Board alone." *NLRB v. Best Prods.*, 765 F.2d 903, 908 (9th Cir. 1985). The deference afforded to the Board in this arena does not recede merely because the Board is applying its election expertise to new or changing circumstances.

Still, Blue School is unable to show anything close to abuse in the Board's refusal to abandon *Aspirus* in this case. Blue School contends that post-*Aspirus* developments in the state of the Covid-19 pandemic—principally with respect to vaccines, vaccination rates, changing government protocols, and the Board's conduct of manual elections at different times and under different conditions—made *Aspirus* "no longer necessary" at the time when the Regional Director scheduled the election. (Br. 39-42.) But just as the Board's initial decision to establish reasonable safety standards was well within its discretionary authority, so, too, was its decision to adhere to its framework in this case little over a year after the pandemic began. It was the Board's prerogative to determine, as a policy matter, and in the exercise of its expansive authority over representation elections, when it might modify or overrule *Aspirus* in response to the pandemic's continuous evolution, including shifting public-health guidance and the Board's

34

own accumulated experience in applying *Aspirus*. *Cf. Sheraton-Kauai Corp. v. NLRB*, 429 F.2d 1352, 1354-1356 (9th Cir. 1970) (upholding "present [Board] policy" as appropriate exercise of discretion even though Board may amend or replace policy "at some future time" based on "further experience").[7]

    Finally, Blue School pivots to criticizing the Board's application of *Aspirus* to the specific circumstances of this case. For one, Blue School wrongly claims that the Board in this case departed from *Aspirus*—a test that preserved the usual presumption in favor of manual elections, 370 NLRB No. 45, slip op. at 2—by "flipp[ing] the presumption" here. (Br. 38.) It did no such thing. Rather, the Board correctly applied *Aspirus* to find that the presumption was successfully overcome by the increasing 14-day trend in new cases. As purported evidence of some "*sub silentio*" alteration of *Aspirus*, Blue School points (Br. 38) to the stated view of one Board member, Chairman McFerran, that the Board should consider revising the presumption as a general policy matter. (SA381 n.1 (referencing her earlier concurrence in *Aspirus*, 370 NLRB No. 45, slip op. 13-15 (McFerran, concurring)).) But the Board majority here did not adopt that position, and the Board unanimously found a mail-ballot election appropriate with the usual

---

[7] Over a year after the election at issue here, the Board ultimately did modify *Aspirus* by replacing two of its standards, including the standard involving the 14-day case trend, with a new metric. *See Starbucks Corp.*, 371 NLRB No. 154, slip op. at 1-3 (Sept. 29, 2022).

35

presumption in place. (SA381 n.1.)

In addition, Blue School states that the Board "erroneously relied" on the increasing positivity rate "without [considering] other relevant factors" and that the positivity rate was "ill-suited" for "mak[ing] policy decisions." (Br. 38, 40.) This claim is mistaken in two ways. First, Blue School misunderstands the Regional Director's basis for ordering a mail-ballot election. In his Decision and Direction of Election, the Regional Director explicitly relied on the increasing 14-day trend in new Covid-19 cases, *not* the 14-day testing positivity rate. (SA330.) Second, the Regional Director expressly considered each of the factors outlined in *Aspirus* and acknowledged that none other than that regarding the 14-day trend applied. (SA330.) In nonetheless basing his decision on the increasing 14-day trend, he recited the Board's guidance that only "one or more" of the *Aspirus* factors need be present for a mail-ballot election to be appropriate. (SA329.) The Regional Director then properly exercised discretion to find that the 14-day trend independently warranted an election by mail. (SA330.)

All in all, Blue School's barrage of attacks fails to breach the wide discretion this Court affords the Board over election administration. Whether by reason of Blue School's waiver or the Board's application of both its traditional test and *Aspirus*, the Court should not disturb the Board's sound direction of a mail-ballot election.

### C. The Board Exercised Sound Discretion in Overruling Blue School's Objection and Certifying the Union Without a Post-Election Hearing

The Board did not abuse its discretion in overruling Blue School's post-election objection without a hearing. That objection—asserting that the Instagram posts of eight employees holding their mail-ballot return envelopes and displaying pro-Union gestures and messages destroyed ballot secrecy and was improper electioneering—is factually and legally insufficient to warrant a hearing, let alone to overturn the election.

### 1. To justify an evidentiary hearing, an employer must offer facts in support of its objection that, if credited, would warrant overturning the election

A party raising an objection to an election bears a "heavy" burden to demonstrate that it should be overturned. *Polymers, Inc. v. NLRB*, 414 F.2d 999-1004 (2d Cir. 1969). The objecting party is not, moreover, entitled to a hearing on its objections "just because it wants one, just because it claims that the election was tainted, [or] just because it says it could really pin things down if it were granted a hearing." *NLRB v. AmeriCold Logistics*, 214 F.3d 935, 939 (7th Cir. 2000); *see also NLRB v. Lance Investigation Service, Inc.*, 680 F.2d 1, 2 (2d Cir. 1982) (dismissing employer's claim that "at the very least, it was entitled to a hearing" on its frivolous objection).

Rather, to obtain a hearing, the objecting party must make an "offer of proof" raising "substantial and material factual issues which, if resolved in its

37

favor, would warrant setting aside the election." *NLRB v. Newton-New Haven Co.*, 506 F.2d 1035, 1036 (2d Cir. 1974) (quoting *Polymers*, 414 F.2d at 1004-05; *see also* 29 C.F.R. § 102.69(c)(1)(i)). The Board sets a high bar in order to "prevent dilatory tactics by employers or unions disappointed in the election returns." *NLRB v. Joclin Mfg. Co.*, 314 F.2d 627, 632 (2d Cir. 1963). Thus, when the proffered evidence, even if credited, would not justify setting aside the results of the election as a matter of Board law, there is nothing "to be heard," and a regional director may resolve the objections without a hearing. *NLRB v. Carl Weissman & Sons, Inc.*, 849 F.2d 449, 452 (9th Cir. 1988); *Durham Sch. Servs.*, 821 F.3d 52, 58 (D.C. Cir. 2016).

Under the Board's Rules, the objecting party's offer of proof must "identify[] each witness the party would call to testify" and "summariz[e] each witness's testimony." 29 C.F.R. § 102.66(c). To adequately identify a witness, the offer of proof must specifically name the individual. *See Heartland of Martinsburg*, 313 NLRB 655, 655 (1994) (submission of witness names is "critical prerequisite" to investigate objections). To adequately summarize a witness's testimony, the offer of proof must convey "what they would say." *800 River Road Operating Co. v. NLRB*, 846 F.3d 378, 387 (D.C. Cir. 2017). Even where these rules are met, the evidence described in the offer of proof "shall not be received" if it "is insufficient to sustain the proponent's position." 29 C.F.R. § 102.66(c).

### 2. Blue School's proffer was insufficient to warrant a hearing, much less establish objectionable conduct

In support of the objection, Blue School submitted screenshots of the Instagram posts and said that Blue School Board Chair Renee Rolleri would testify that the eight employees engaged in pro-Union conduct by making them. (SA736; SA707, 711-731.) It also stated its intention to subpoena "some or all of the eight employees" to ask about the motivation behind the posts and "the Union representative, if any" to probe whether the Union instructed employees on how to cast their ballots. (SA736; SA707.) This anemic offer failed to raise any substantial and material issue that required a hearing.

The Board properly found that Blue School's offer of proof indicating plans to subpoena "some or all of the eight employees" and "the Union representative, if any" did not satisfy the Board's threshold requirements. (SA736.) Blue School neither named the employees in question nor indicated which would testify. (SA736.) Likewise, its offer to subpoena "the Union representative, if any" neglected to name a specific individual. (SA736.) Blue School similarly failed to summarize the unnamed employees' or Union representative's anticipated testimony. Its offer of proof merely stated the types of information that Blue School was seeking: employees' motivation behind the posts and whether the Union gave any instructions to employees on casting their ballots. (SA736; SA707.) Blue School never indicated—as the Board's regulations require—what

39

either the employees or the Union representative would affirmatively convey. As the Board explained, it has consistently held that hearings are not to be used as "fishing expeditions" for objecting parties to gather evidence otherwise unknown to them. (SA736.) *See Natter Mfg. Corp. v. NLRB,* 580 F.2d 948, 952 n.4 (9th Cir. 1978) (rejecting argument that, "without a hearing . . . , [employer] has no effective method of acquiring the evidence the Board demands" because it is not "entitled to a fishing expedition in order to prove its wholly unsubstantiated assertions"). In short, Blue School's offer of proof was fatally devoid of any specifics necessary to warrant a hearing, and the Board properly refused to allow Blue School to use the hearing as a discovery tool.

The Board next considered whether the proffered evidence, if taken as true, was sufficient to set aside the election. Because the standard for evaluating pre-election misconduct differs based on the identity of the actors, the Board first considered the standard by which to evaluate the alleged misconduct. The Board will find that conduct by a party or its agents warrants overturning the election if the conduct at issue "reasonably tended to interfere with the employees' free and uncoerced choice," *NLRB v. Birnie Bus Service, Inc.*, 116 F.3d 1472, 1472 (2d Cir. 1997) (quotation omitted). Conversely, the Board will find that conduct by a third party, such as employees supporting the union, is objectionable where it "so substantially impaired the employees' exercise of free choice as to require that the

40

election be set aside." *Amalgamated Serv. & Allied Indus. Joint Bd. v. NLRB*, 815 F.2d 225, 230 (2d Cir. 1987) (quotation omitted).

The burden of demonstrating agency is on the party asserting it exists. *Green Apple Supermarket of Jamaica, Inc.*, 366 NLRB No. 124, slip op. at 14 (2018), *enforced*, 805 F. App'x 65 (2d Cir. 2020). The agency relationship must exist with respect to the particular conduct claimed to be unlawful. *Id.* A person can act as the agent of a party if they possess either actual or apparent authority to act on the party's behalf. *Id.*

As the Board explained, Blue School never alleged, and its offer of proof contained no evidence showing, that the employees were acting as union agents or that the Union ever conferred actual or apparent authority on the employees to speak on the Union's behalf, either for the purpose of making their Instagram posts or otherwise. (SA737). Given this lack of evidence, the Board properly determined that the Union never provided any reason to believe that the employees' Instagram posts spoke for the Union. (SA737.) The Board, even assuming as true that the Union controlled the Blue School Union Instagram page, explained that the Union merely sharing employees' posts was insufficient to give the appearance that the employees spoke on its behalf. (SA737.) At most, the Union publicized the employees' own engagement in "vocal and active union support[]," which is not enough for agency to attach. (SA737 (quoting *United*

41

*Builders Supply Co.*, 287 NLRB 1364, 1364-65 (1988) (employee not a union agent despite being "a leading, if not the leading, union supporter").) Given the absence of any evidence showing agency, the Board appropriately applied the third-party standard and determined that the employees' conduct did not substantially impair the employees' exercise of free choice as to require that the election be set aside.[8] (SA738-740.)

In finding no reason to set aside the election, the Board first concluded that employees' pictures of ballot-return envelopes and disclosure of their support for the Union in the Instagram posts failed to show any effect on ballot secrecy. (SA738.) The Board conducts its elections by secret ballot in order to protect employees "from pressures, originating with either employers or unions, to prove the way in which their ballots had been cast." *J. Brenner & Sons, Inc.*, 154 NLRB 656, 659 n.4 (1965). However, the Board's goal is "to guarantee the secrecy of the ballot," not to "prevent a voter from voluntarily disclosing how he voted . . . ." *Luntz Iron & Steel Co.*, 97 NLRB 909, 910 (1951). When considering whether an election may be set aside, the Board thus looks for "evidence that someone witnessed how a voter marked his or her ballot." *American Medical Response*, 356 NLRB 199, 199 (2010), *enforced*, 477 F. App'x 743 (D.C. Cir. 2012).

---

[8] Notably, the Board also determined that even assuming the employees were acting as union agents, Blue School's offer of proof was still insufficient to set aside the election under that standard. (SA737-738 & n.3.)

42

In determining that the offer of proof failed to demonstrate that the Instagram posts destroyed ballot secrecy, the Board principally relied on the fact that the posts only pictured employees' ballot-return envelopes and not their inner contents.  (SA387-388, 738.)  As the Board noted (SA388), whenever it has invalidated a ballot due to a voter's failure to maintain secrecy, the marked ballot itself was shown to others.  *See, e.g.*, *Sorenson Lighted Controls, Inc.*, 286 NLRB 969, 969 (1987) (ballot void because employee accidentally showed actual ballot to another employee).

Nor did the accompanying gestures and written statements compromise ballot secrecy.  As the Board explained, "whatever an employee may tell a union about how she *intends* to vote, and however a union may publicize that disclosure, the fact remains that the employee's actual vote will *be* secret."  (SA738-739, quoting *Durham School Servs., LP*, 360 NLRB 851, 852 (2014).).  Here, then, employees were free to express their support for the Union in the Instagram posts and the Union could freely share the posts because the markings on employees' actual ballots were known only to themselves.  (SA738-739.)  Accordingly, the Board aptly concluded that, taking the offer of proof on its face, the posts did nothing to disturb ballot secrecy.

Again accepting the truth of the offered facts, the Board also properly determined that the potential visibility of the Instagram posts to other Blue School

43

employees on the platform fell far short of any standard for electioneering. (SA739-740.) Electioneering is a term of art in Board law that refers to certain prohibited practices that the Board views as injurious to employee free choice in voting. *See NLRB v. Hudson Oxygen Therapy Sales Co.*, 764 F.2d 729, 732 (9th Cir. 1985) ("[t]he Board permits legitimate 'electioneering' subject to specific regulations").

Under the rule of *Milchem, Inc.*, 170 NLRB 362 (1968), parties or their agents may not engage in "prolonged conversations" with voters waiting in line to cast ballots "at or near the polling place." *Id.* at 362-363. Where those factors are not present, the Board "'makes a judgment, based on all the facts and circumstances, whether the electioneering substantially impaired the exercise of a free choice so as to require the holding of a new election.'" *Bos. Insulated Wire & Cable Sys., Inc. v. NLRB*, 703 F.2d 876, 881 (5th Cir. 1983) (quoting *Glacier Packing Co.*, 210 NLRB 571, 573 n.5 (1974)). Relevant circumstances include the nature and extent of the electioneering and whether it occurred in a prohibited area. *See, e.g.*, *Del Rey Tortilleria, Inc.*, 272 NLRB 1106, 1107-1108 (1984), *enforced*, 823 F.2d 1135 (7th Cir. 1987). Common to both *Milchem* and *Boston Insulated Wire* is a requirement of close physical proximity between campaigners and the place of voting, such that voters must involuntarily confront campaigners shortly before casting their ballots. *See Milchem*, 170 NLRB at 362 ("The final minutes

44

before an employee casts his vote should be his own, as free from interference as possible.")

Based on the proffered evidence, the Board reasonably found that the social media posts did not meet the requirements of electioneering. (SA739-740.) The posts, existing only online, did not physically confront employees during voting. Thus, unlike campaigners outside of a polling site (or, say, an organizer standing at an employee's mailbox on the day ballots arrived), the posts could easily be avoided. In fact, as the Board explained, any voter who viewed the posts would have done so voluntarily by opening the Instagram application or website. Once there, voters would likely not have seen the posts unless they were willingly "following" the accounts sharing the posts or affirmatively chose to visit them. As the Board underscored (SA739), it has never barred voters from voluntarily seeking information prior to casting a ballot, even after the polls have opened. *See, e.g.*, *Neb. Consol. Mills, Inc.*, 165 NLRB 639, 639-40 (1967) (employees remain free at any point to voluntary attend campaign speech on their own time).

The Board also concluded that, even if employees somehow involuntarily saw the posts directly before casting their mail ballots, the employees' expressions of support were akin to the unobjectionable conduct of employees wearing pro- or anti-union paraphernalia to vote. (SA739.) The Board, with court approval, has consistently refused to set aside an election merely because voters may have seen

45

individuals at or near the polling place donning campaign buttons or apparel. *Aero Indus., Inc.*, 314 NLRB 741, 759 (1994) (union supporter wore union insignia and the word "union" on shirt during election) (citing *NLRB v. IDAB, Inc.*, 770 F.2d 991, 999-1000 (11th Cir. 1985), *EDS-IDAB, Inc. v. NLRB*, 666 F.2d 971, 976 n.6 (5th Cir. 1982), and *Nestle Co.*, 248 NLRB 732, 742 (1980), *enforced mem.*, 659 F.2d 252 (D.C. Cir. 1981)); *Mar-Jac Poultry Co.*, 123 NLRB 1571, 1572-73 (1959) (employees paraded around the plant in the half hour before the election wearing hats that said "Vote No"). Just as employees' free choice in voting would not be impaired by seeing individuals wearing pro-union paraphernalia at the polls, nothing is objectionable about voters potentially viewing images of the employees here with pro-Union gestures or messages before casting their mail ballots.

### 3. Blue School's arguments are unavailing

Challenging the Board's well-substantiated denial of a hearing on its objection, Blue School tosses out the seeds of several arguments. They land on barren soil.

Blue School first argues that its offer of proof was sufficient, but its reasoning is vague, conclusory, and, most importantly, wrong. For instance, Blue School says, without elaboration, that its offer "identified numerous witnesses and provided a summary describing anticipated testimony" (Br. 54), but it fails to articulate any specifics that would rebut the Board's contrary determination. Blue

46

School likewise claims that it "clearly set forth three categories of information the requested subpoenas would seek" (Br. 54-55), yet it never contends with the Board's finding that identifying areas of inquiry does not meet the threshold for summarizing testimony. Further, it states that it "provided specific evidence that [the Instagram posts] interfered with employees' exercise of free choice" (Br. 54), simply asserting, without any reasoning, the opposite of the Board's conclusion. None of Blue School's declarations add up to an argument against the Board's determination.

Blue School next contends that it could not have alleged that the eight employees were union agents in its offer of proof because Board rules left it with a "Hobson's choice." In Blue School's framing, if it were to have inquired into the facts necessary to adequately allege agency, it would have been unlawfully interrogating employees, but, if it did not, it would have failed to establish objectionable conduct. Blue School's manufactured "choice" assumes too much. First, even if it had alleged agency, the Board would still have found—as it did here (SA737-738 & n.3)—that the Instagram posts were unobjectionable under the agency standard. Second, Blue School's assumption that it could not inquire into agency status without committing an unfair labor practice is mistaken as a statement of Board law. The Board affords employers a limited privilege from liability for questioning employees about their labor activity when, in seeking

47

information in support of election objections, employers interview employees non-coercively and provide them with certain assurances. *Desert Inn & Country Club*, 220 NLRB 877, 879-880 & n.7 (1975).[9] Blue School offers no reason why its hypothetical investigation would have needed to fall outside this safe harbor.

Finally, Blue School accuses the Board of "obliviousness" in the face of "the upheaval that social media has caused in every facet of current life." (Br. 57.) Unable to muster evidence of objectionable conduct, Blue School brandishes the banner of "social media revolution" to distract the Court from the Board's reasoned analysis. Contrary to Blue School's sweeping and unsupported claim, the Board here considered the Instagram posts and reasonably concluded that legitimate campaign speech voluntarily visible on social media simply could not be equated to campaigners physically standing outside the polls. Such an assessment was well within its realm of election expertise.

### C. The Board's Order is Final and Reviewable

The Board's Order mandates immediate relief to remedy Blue School's failure to recognize and bargain with the Union, rendering the Order final and reviewable. Blue School's contention that the Board's severance of a discrete remedial issue makes the Order nonfinal is contrary to the Act and established

---

[9] This Court engages in a similar inquiry and asks whether the totality of the circumstances indicates coercion did not occur. *See NLRB v. Monroe Tube Co.*, 545 F.2d 1320, 1328 (2d Cir. 1976).

48

principles of administrative finality. It also ignores that the Board routinely severs issues in unfair-labor-practice cases without affecting finality of the order.

### 1. The Act and administrative finality principles support judicial review of the Board's Order now

The Board's Order is final under Section 10(c) and (e) of the Act (29 U.S.C §§ 160(c), (e)) and conforms with principles of administrative finality. Section 10(c) of the Act provides that if the Board determines "that any person named in [an unfair-labor-practice] complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue . . . an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action . . . as will effectuate the policies of this Act." 29 U.S.C. § 160(c). In turn, Section 10(e) empowers the Board to petition an appropriate court of appeals "for the enforcement of such order," and provides that upon the filing of such petition, the court "shall have jurisdiction of the proceeding and of the question determined therein." 29 U.S.C. § 160(e).

The Order now before the Court on the Board's application for enforcement is precisely the type of reviewable order identified in Section 10(c) and (e) of the Act. The Board determined that Blue School violated the Act and issued a remedial order directing Blue School to "[c]ease and desist from" this violation and to take specified "affirmative action" deemed "necessary to effectuate the policies of the Act" including immediately bargaining with the Union on request.

49

Thus, the Board's Order unmistakably "grant[s] . . . relief relating to an unfair labor practice" and "result[s] from the culmination of the procedure outlined in" Section 10(c) of the Act. *Shell Chem. Co. v. NLRB*, 495 F.2d 1116, 1120 (5th Cir. 1974). Accordingly, Section 10(e) gives the Court jurisdiction to review the order. Indeed, the Supreme Court long ago affirmed courts of appeals' jurisdiction to review Board orders "prohibiting an unfair labor practice" or "directing [an] employer to do something" to remedy such a violation, including where, as here, such an order is "predicated upon the results of [a representation] election." *Am. Fed'n of Labor v. NLRB*, 308 U.S. 401, 406-11 & n.3 (1940) (quotation marks omitted).

Moreover, general principles of administrative finality warrant the Court's immediate review. In evaluating the finality of administrative orders, this Court considers "whether the process of administrative decisionmaking has reached a stage where judicial review will not disrupt the orderly process of adjudication and whether rights or obligations have been determined or legal consequences will flow from the agency action." *Env't Def. Fund v. Johnson*, 629 F.2d 239, 241 (2d Cir. 1980) (quotation omitted).

Here, both requirements for finality have been met. First, the Court's review will not disrupt the case because the Board has spoken its "last word" on every issue, factual and legal, now before the Court. *Alaska v. EPA*, 244 F.3d 748, 750

50

(9th Cir. 2001), *affirmed*, 540 U.S. 461, 483. Concerning those issues, the Board's

determinations are "unalterable," *id.*—they are not in any manner conditioned on,

or subject to revision in, the Board's handling of the sole severed issue. Thus,

"[the Court's] review now does not prevent [the Board] from bringing its expertise

to bear," *Public Utils. Comm'n v. FERC*, 894 F.2d 1372, 1377 (D.C. Cir. 1990),

and there is no possibility that future agency action on the severed issue may

"obviate the need" for such review, *Acura of Bellevue v. Reich,* 90 F.3d 1403,

1408-09 (9th Cir. 1996). Second, "[b]y reason of the [Order]," Blue School clearly

"has the legal obligation" to perform various affirmative acts, *Sackett v. EPA,* 566

U.S. 120, 126 (2012), including bargaining with the Union, posting a remedial

notice, and filing a sworn attestation of compliance.

### 2. Severance does not affect the Court's review

The Order's finality is not altered by the Board's decision to sever and retain

the General Counsel's request for an additional remedy. An agency's order or

other action "may be final [for purposes of judicial review] though it is not the very

last step in the administrative process." *Mountain States Tel. & Tel. Co. v. FCC*,

939 F.2d 1021, 1027 (D.C. Cir. 1991). This principle is reflected in *Stephens*

*Media, LLC*, 677 F.3d 1241 (D.C. Cir. 2012), where the D.C. Circuit squarely held

the Board's order to be final notwithstanding that the Board had severed and

retained a distinct allegation and thereby "removed [it] . . . from the realm of [the]

case [before the court]." *Id.* at 1249-50.

The Board routinely severs issues in its unfair-labor-practice proceedings. For example, the Board will, on occasion, sever a remedial issue for further consideration while simultaneously issuing a final unfair-labor-practice order providing other immediate remedies—just as it did here. Appellate courts have reviewed and upheld the non-severed aspects of such decisions. *See Picini Flooring*, 355 NLRB 606, 612 & n.23 (2010) (severing electronic-notice-posting issue), *enforced sub nom. Int'l Union of Painters v. J&R Flooring, Inc.*, 656 F.3d 860 (9th Cir. 2011) (reviewing non-severed portions of case); *see also Kentucky River Med. Ctr.*, 355 NLRB 643, 647-48 & n.13 (2010) (severing compound-interest issue), *enforcement denied on other grounds sub nom. Jackson Hosp. Corp. v. NLRB*, 647 F.3d 1137 (D.C. Cir. 2011) (reviewing non-severed portions); *Freeman Decorating Co.*, 336 NLRB 1, 12 (2001) (remanding issue of potential instatement-and-backpay remedy), *enforcement denied on other grounds sub nom. IATSE Local 39 v. NLRB*, 334 F.3d 27 (D.C. Cir. 2003) (reviewing non-severed portions).

Similarly, the Board severs unfair-labor-practice allegations while issuing a final order on other, analytically distinct allegations, and reviewing courts have likewise upheld the non-severed portions of such Board decisions. *E.g., Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 207 n.2 (5th Cir. 2014); *Stephens Media,*

52

*LLC*, 356 NLRB 661, 663 (2011), *enforced*, 677 F.3d 1241, 1249-50 (D.C. Cir. 2012); *Roundy's Inc.*, 356 NLRB 126, 126-27 (2010), *enforced*, 674 F.3d 638, 645 (7th Cir. 2012); *Kamtech, Inc.*, 333 NLRB 242, 243 (2001), *enforced*, 314 F.3d 800, 806 (6th Cir. 2002); *see also Palace Station Hotel & Casino*, 367 NLRB No. 129, slip op. at 1-2 & n.5 (2019) (severing information-request allegation and issuing final order addressing employer's unlawful refusal to bargain after union certification).

Notably, in circumstances essentially identical to the present case, the D.C. Circuit recently reviewed a post-certification bargaining order notwithstanding that the Board had severed and retained the exact same remedial issue as here. *Longmont United Hosp. v. NLRB*, 70 F.4th 573, 581-82 (D.C. Cir. 2023). Granting enforcement of the Board's "final order," the court held that the Board's decision to "sever[] a remedial issue for future consideration" did "not affect [the court's] jurisdiction to . . . adjudicate issues that the Board [had] resolved." *Id.* at 578, 582.

As *Longmont* resoundingly underscores, the Board's decision here to sever for further consideration one potential additional remedy is consistent with the above-summarized precedent and does not negate the Court's jurisdiction over the Order now before it. The instant Order unquestionably constitutes "an order" as described in Section 10(c), 29 U.S.C. § 160(c), even though the Board will address the severed remedial issue in a separate, supplemental decision at a later date

53

(SA1148), and the Board unquestionably sought "enforcement of such order" under Section 10(e), 29 U.S.C. § 160(e).

The Board's severance determination also accords with its authority to manage its proceedings. *Cf. NLRB v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Loc. 433*, 600 F.2d 770, 779 (9th Cir. 1979) (approving as "orderly and efficient" Board's decision to leave for later administrative proceedings identification of discriminatees and determination of any backpay due).[10] As the Board here explained, it severed the additional remedial issue to "expedite" the issuance of its Decision and Order. (SA1148.) This sound explanation carries particular force in the context of this case—where an employer's outright refusal to commence collective bargaining denies employees' certified choice of union representation. *See Longmont United Hosp.*, 371 NLRB No. 162, slip op. at 2 (severing issue to "expedite" bargaining order), *enforced*, 70 F.4th 573; *Palace Station*, 367 NLRB No. 129, slip op. at 1-2 & n.5 (severing distinct allegation to avoid "further delay[ing] action" on employer's post-

---

[10] Blue School distorts (Br. 24) *Iron Workers* in a failed attempt to undercut the finality of the Board's Order. There, the Ninth Circuit noted its approval of the Board's "typical" bifurcated approach "[i]n computing backpay claims" where, unlike here, the Board *has already determined* that a backpay award (a type of monetary remedy) is appropriate. 600 F.2d at 777-79. Contrary to Blue School's contention (Br. 24), neither this approval nor any other aspect of *Iron Workers* supports refusing to review a Board order that, as here, directs immediate, *non*-monetary remedies simply because the Board has also severed for further consideration a potential monetary remedy.

54

certification refusal to bargain).

### 3. Blue School's challenges to finality lack merit

Blue School's challenges to finality are wholly unavailing. First, it asserts (Br. 20) that the Board, by severing a remedial issue for further consideration, contravened the text of Section 10(c) of the Act, which it claims mandates a single order resolving all potential remedial issues for a given unfair labor practice. However, nothing in Section 10(c) categorically compels the Board to resolve every potential remedial issue concerning a given violation in a single order. Section 10(c)'s language (Br. 20-21) stating that the Board shall issue "an order" of a certain remedial character, 29 U.S.C. § 160(c), does not forbid the Board from issuing such an order while also severing for further consideration a potential additional remedy for the same violation, as it did here and has previously done. As Blue School concedes (Br. 21, 24), the Board may very well not order an additional remedy in the severed proceedings.[11] However, *if* the Board were to do so, that would be entirely consistent with the language of Section 10(c). Having already issued "an order" requiring Blue School to "cease and desist" from the violation found and take specific "affirmative action" that "will effectuate the policies of [the Act]," nothing in the statute would preclude the Board from

---

[11] For this reason, Blue School's claim that the severed remedy, if adopted, would "infringe on employers' rights" and "violate the [Act]" (Br. 22) is obviously "premature." *Longmont*, 70 F.4th at 582.

55

subsequently ordering additional "affirmative action" that also "will effectuate" those policies.  29 U.S.C. § 160(c).

In support of its claim to the contrary, Blue School not surprisingly ignores *Longmont*—which is directly on-point—and instead relies on *NLRB v. G & T Terminal Packaging Co.*, 246 F.3d 103 (2d Cir. 2001).  But in that case, this Court stated the uncontroversial principle that when the Board leaves remedial details to be addressed in a subsequent compliance proceeding, the remaining issues "must merely flesh out and follow from the remedy ordered by the Board."[12]  *Id.* at 125. Here, the Board did not leave anything to a compliance proceeding.  It severed and retained for further consideration the request for make-whole relief, a remedy distinct from the bargaining remedy already ordered.

There is also no merit to Blue School's assertion that the Board's stated aim of expediting resolution of the case's remaining issues—chiefly, ordering Blue School to commence bargaining with the Union—"contradict[s] the intent of Congress."  (Br. 23.)  That claim rests on a distorted reading (Br. 23) of *Boire v. Greyhound Corp.*, 376 U.S. 473 (1964).  *Boire* discussed Congress' intention to "delay[]" parties' "attempts to challenge [in court] the validity" of the Board's

---

[12] Board proceedings are bifurcated into a liability phase and, if necessary, a damages phase, known as a compliance proceeding.  *See NLRB v. Katz's Delicatessen of Houston Street, Inc.*, 80 F.3d 755, 771 (2d Cir. 1996) (likening compliance to a civil trial's damages phase).  The Supreme Court has approved this practice.  *See generally Sure-Tan*, *Inc. v. NLRB*, 467 U.S. 883, 902 (1984).

56

election-certification decisions, not to delay the Court's enforcement of a reviewable bargaining order once, as here, the Board has found that a party's post-certification refusal to bargain violates the Act. *Id.* at 477-79 (direct review of certification decisions prohibited to avoid "dilatory tactics in representation proceedings") (internal citation omitted).

In addition to its two primary claims, Blue School contends that enforcing the Board's final order at this juncture would be "unfair, unworkable, and extremely inefficient" because it cannot negotiate in good faith without knowing the full extent of its financial liability. (Br. 24-25.) This unsupported argument is sweeping in its breadth. Employers routinely face exposure for potential legal violations, whether under the Act or other employment statutes. If they were permitted to use such contingencies as an excuse to delay or refuse bargaining, it would render the duty to bargain virtually meaningless.

Lastly, Blue School relies (Br. 25-26) on inapplicable caselaw concerning appellate review of district court decisions pursuant to 28 U.S.C. § 1291. That statute vests the circuit courts with jurisdiction to hear "appeals from all final decisions of the district courts of the United States." But it is Section 10 of the Act, not 28 U.S.C. § 1291, that defines this Court's jurisdiction to review Board orders.

57

# CONCLUSION

For the foregoing reasons, the Board respectfully requests the Court enforce the Board's Order in full.

Respectfully submitted,

/s/ Elizabeth A. Heaney
ELIZABETH A. HEANEY
    *Supervisory Attorney*

/s/ Jared H. Odessky
JARED H. ODESSKY
    *Attorney*

National Labor Relations Board
1015 Half Street, SE
Washington, DC 20570
(202) 273-1937
(202) 273-1743

JENNIFER A. ABRUZZO
    *General Counsel*

PETER SUNG OHR
    *Deputy General Counsel*

RUTH E. BURDICK
    *Deputy Associate General Counsel*

DAVID HABENSTREIT
    *Assistant General Counsel*

May 1, 2024

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | |
| Petitioner | ) | No. 23-6305 |
| | ) | |
| v. | ) | Board Case No. |
| | ) | 02-CA-294227 |
| BLUE SCHOOL | ) | |
| | ) | |
| Respondent | ) | |

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that this brief contains 13,568 words of proportionally spaced, 14-point

type, and the word processing system used was Microsoft Word 365.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 1st day of May 2024

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| NATIONAL LABOR RELATIONS BOARD | ) | |
| | ) | |
| Petitioner | ) | No. 23-6305 |
| | ) | |
| v. | ) | Board Case No. |
| | ) | 02-CA-294227 |
| BLUE SCHOOL | ) | |
| | ) | |
| Respondent | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on May 1, 2024, I electronically filed the foregoing with the Clerk for the Court of the United States Court of Appeals for the Second Circuit by using the appellate ACMS system. I further certify that this document was served on all parties or their counsel of record through the appellate ACMS system.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 1st day of May 2024